**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SUNEDISON, INC. SECURITIES LITIGATION | No. 16-md-02742-PKC |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| This Document Applies to: | |
| *In re Terraform Global, Inc. Securities Litigation,* 16-cv-07967-PKC, and consolidated cases | **JURY TRIAL DEMANDED** |

Lead Plaintiff Pyramid Holdings, Inc. and Plaintiffs Iron Workers Mid-South Pension Fund and Simon Fraser (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon: the investigation of Plaintiffs' counsel, including a review of United States Securities and Exchange Commission ("SEC") filings by or concerning TerraForm Global, Inc. ("Global" or the "Company") and SunEdison, Inc. ("SunEdison"), as well as securities analysts' reports and advisories about the Company and/or SunEdison, press releases and other public statements issued by the Company and/or SunEdison, media reports about the Company and/or SunEdison, and publicly filed lawsuits against the Company and/or SunEdison.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action asserting claims arising under the Securities Act of 1933 (the "Securities Act") brought on behalf of purchasers of the common stock of Global issued pursuant to or traceable to a registration statement (the "Registration Statement") filed with the SEC with respect to a July 31, 2015 initial public offering (the "IPO"), and who were damaged thereby.  Plaintiffs' claims herein do not sound in fraud.  For all the claims stated herein, Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional conduct or recklessness.

2.      Global owns and operates clean power generation assets in emerging market countries.  It is structured as a "YieldCo," which is an entity designed to generate dividends and grow by acquiring power generation assets from its sponsor.  Here, SunEdison was Global's sponsor and controlling parent company.  Global was SunEdison's second YieldCo spinoff, as it had spun off its first YieldCo, TerraForm Power Inc. ("TERP"), approximately one year earlier in 2014.  Global and TERP are jointly referred to herein as the "YieldCos."

3.      As the parent company or sponsor of its two YieldCos, SunEdison took on the risk of underwriting and developing new renewable energy project construction.  It negotiated long-term

"power purchase agreements" ("PPAs") with utility companies to provide electricity generated from the projects, which were typically for 15-to-20 year terms. Once a project was constructed, it would be dropped down to a YieldCo, which would then receive the stable cash flows of operating assets from the long-term PPAs, benefiting the YieldCo's shareholders with consistent dividend payouts.

4.      TERP focused on projects in more developed markets, primarily the United States and select other countries. By contrast, Global was initially intended to focus on acquiring and operating solar and other renewable energy assets in developing countries like Brazil, India, China, and other emerging markets. SunEdison controlled both YieldCos by owning more than 90% of the voting power of the YieldCos. SunEdison, pursuant to the terms of management services agreements, was responsible for carrying out all day-to-day management, accounting, banking, treasury, administrative and regulatory functions and obligations of the YieldCos. Further, by spinning off its YieldCos through initial public offerings, SunEdison raised capital for itself to fund further acquisitions.

5.      In the IPO, Terraform sold 45 million shares of Class A common stock at $15 per share to raise approximately $675 million. The final prospectus (the "Prospectus") incorporated with the Registration Statement (collectively with the Prospectus, the "Offering Documents") was filed with the SEC on August 4, 2015. In describing Global's business model and future prospects, the Offering Documents explained, *inter alia*, that Global would rapidly conduct asset acquisitions as a result of its priority purchase rights from its sponsor, SunEdison. In particular, Global would enter into a support agreement with SunEdison whereby SunEdison would offer it assets "projected to generate an aggregate of at least $1.4 billion of cash available for distribution during their respective first twelve months of commercial operations." Global was thus heavily dependent upon its sponsor SunEdison for its business model to succeed.

6.      However, by the time of the IPO, and undisclosed to investors, SunEdison was experiencing massive liquidity and financial setbacks that necessitated abandonment of the YieldCo strategy. Within two months of the IPO, SunEdison was forced to admit that it did not expect to sell any projects at all to Global through 2016. This included the admission that SunEdison would

"pivot to third-party sales" because there was "a disconnect between the value of these underlying assets and what people are willing to pay for them in a YieldCo." When these and other disclosures about SunEdison's precarious financial position were made, Global's stock price declined materially.

7.     Over the remainder of 2015 and into the spring of 2016, SunEdison continued its downward spiral, leading it to file for bankruptcy in April 2016. Global was essentially left with no functioning sponsor to feed it the necessary energy projects to grow.

8.     As a result of the false and misleading portrayal of the financial condition of Global's sponsor and the viability of the YieldCo strategy in the Offering Documents, Plaintiffs and other purchasers of Global common stock suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

10.     This Court has jurisdiction of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1331.

11.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District and the Judicial Panel on Multi-District Litigation in an Order dated October 4, 2016 selected this District as the proper forum for coordination of pre-trial proceedings. The Company's stock trades on the NASDAQ.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     Lead Plaintiff Pyramid is a private investment entity that invests in securities. As set forth in the certification previously filed, and incorporated by reference herein, Pyramid purchased the common stock of Global during the IPO and suffered damages as a result of the federal securities

law violations and the materially false and/or misleading statements and/or material omissions alleged herein.

14.     Plaintiff Iron Workers Mid-South Pension Fund purchased Global common stock in connection with the IPO and suffered damages as a result of the federal securities law violations and the materially false and/or misleading statements and/or material omissions alleged herein.

15.     Plaintiff Simon Fraser purchased Global common stock in connection with the IPO and suffered damages as a result of the federal securities law violations and the materially false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Global is a renewable energy company that owns long-term contracts with solar, wind, and hydro-electric power plants.  Its stated business objective is to increase its dividend to stockholders by continuing to acquire clean power generation assets that produce high-quality, long-term contracted cash flows, primarily by serving utility and commercial customers with strong credit profiles.  Global's portfolio of assets includes projects in China, India, South Africa, Honduras, Costa Rica, Nicaragua, Peru, Brazil, Uruguay, Malaysia and Thailand.  The Company is incorporated in Delaware and has its principal executive offices at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814.  Global is strictly liable for the materially false and misleading statements and/or omissions in the Offering Documents.

17.     Non-party SunEdison, together with its consolidated subsidiaries, is a globally diversified developer of wind and solar energy projects.  It has developed over 1,300 solar and wind projects in 20 countries.  SunEdison maintains its principal executive offices at 13736 Riverport Drive, Suite 180, Maryland Heights, Missouri 63043.  Together with its subsidiaries, SunEdison owns all of Global's Class B common stock.  Each share of Class B common stock entitles SunEdison to 100 votes on all matters presented to stockholders generally.  By contrast, each share of Global's Class A common stock, which was offered for sale pursuant to the IPO, entitles its holder to one vote on all matters presented to stockholders generally.  This means that immediately following the IPO, holders of Class A common stock collectively held 100% of the economic

interests in Global, but only 1.9% of the voting power.  SunEdison held the remaining 98.1% of the voting power in Global.

18.     Defendant Ahmad Chatila ("Chatila") was the Chairman of Global's board of directors at the time of the IPO, and signed or authorized the signing of the false and misleading Registration Statement.  He also serves as the President, Chief Executive Officer, and member of the board of directors for SunEdison, and is based at SunEdison's headquarters in Belmont, California.

19.     Defendant Carlos Domenech Zornoza ("Zornoza" or "Domenech") was Global's Chief Executive Officer and director at the time of the IPO, as well as serving as President of SunEdison.  He also signed or authorized the signing of the false and misleading Registration Statement.

20.     Defendant Jeremy Avenier ("Avenier") was Global's Chief Financial Officer at the time of the IPO.  He signed or authorized the signing of the false and misleading Registration Statement and related documents.  He is currently a vice president at SunEdison.

21.     Defendant Martin Truong ("Truong") was a member of Global's board of directors at the time of the IPO.  He has also served at SunEdison's Senior Vice President, General Counsel and Secretary.   Truong signed or authorized the signing of the false and misleading Registration Statement and related documents.

22.     Defendant Brian Wuebbels ("Wuebbels") was a member of Global's board of directors at the time of the IPO.  He has also held the positions of Executive Vice President, Chief Financial Officer, and Chief Administrative Officer at SunEdison.  Wuebbels signed or authorized the signing of the false and misleading Registration Statement and related documents.

23.     Defendants Chatila, Zornoza, Avenier, Truong and Wuebbels are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants, as senior executive officers and/or directors of Global and its sponsor SunEdison, were privy to confidential and proprietary information concerning Global and SunEdison, their operations, finances, financial condition and present and future business prospects.  They had the power to control the contents of Global's statements to the SEC and the market.  They

are liable for the materially untrue and misleading statements in the Offering Documents as alleged herein.

25.     Defendants J.P. Morgan Securities LLC ("J.P. Morgan"), Barclays Capital Inc. ("Barclays"), Citigroup Capital Markets, Inc. ("Citigroup"), Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman Sachs & Co. ("Goldman Sachs"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Deutsche Bank Securities Inc. ("Deutsche Bank"), BTG Pactual US Capital LLC ("BTG"), Itau BBA USA Securities, Inc. ("Itau"), SMBC Nikko Securities America, Inc. ("SMBC Nikko"), SG Americas Securities, LLC ("SG Americas") and Kotak Mahindra Inc. ("Kotak") all served as underwriters for the IPO.  Collectively, J.P. Morgan, Barclays, Citigroup, Morgan Stanley, Goldman Sachs, Merrill Lynch, Deutsche Bank, BTG, Itau, SMBC Nikko, SG Americas and Kotak shall be referred to herein as the "Underwriter Defendants."

26.     The Underwriter Defendants assisted Global in planning the IPO and as such had access to non-public information concerning Global and SunEdison's businesses and finances. Several of the Underwriter Defendants were also involved in other financing transactions with SunEdison just prior to or after the IPO, and accordingly had additional access to non-public information concerning SunEdison's precarious financial situation in particular.  The Underwriter Defendants also arranged multi-city roadshows prior to the IPO between July 21, 2015 and July 29, 2015 to market the IPO.

27.     In connection with the IPO, the Underwriter Defendants marketed Global stock to potential investors using materially false or misleading information about the Company, and/or omitted material information required to be disclosed in the Offering Documents and elsewhere. The Underwriter Defendants also caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO.  They are liable to Plaintiffs and those similarly situated under the Securities Act.

## SUBSTANTIVE ALLEGATIONS

28.     Defendant Global was formed as a YieldCo.  A YieldCo is a dividend growth-oriented public company, created by a parent company (here, SunEdison), that bundle long-term

contracted operating assets in order to generate predictable cash flows. The parent company acquires assets, such as power-generating plants, and then sells those assets and their customer contracts for power purchasing to the YieldCo. The contracts then generate ongoing cash flows, which are meant to be distributed to the YieldCo's shareholders in the form of dividends. This investment can be attractive to shareholders because they can expect low-risk returns (or yields) that are projected to increase over time. The capital raised by the parent company through the sale of assets to the YieldCo can then be used to pay off expensive debt or finance new projects at attractive rates. However, in order for a YieldCo to obtain capital to finance its acquisitions from its parent company, it frequently turns to an IPO.

29.     Global's IPO followed this model. SunEdison, together with its consolidated subsidiaries, acted as Global's sponsor, with Global remaining under SunEdison's control after the IPO through SunEdison's ownership of all of Global's Class B common stock. Global's business model relied on SunEdison's ability to acquire assets, which assets could then be sold to Global for their contracted long-term revenue streams. SunEdison's ability to acquire assets to drop down to Global was essential to Global's business model.

### *Global's Business Built on the Back of SunEdison's Financial House of Cards*

30.     SunEdison was, at the time of the IPO, one of the world's largest renewable energy developers propelled by aggressive and expensive project acquisitions. As set forth below, SunEdison assumed enormous debt in order to fund the development and construction of renewable energy projects that would eventually be dropped down to the YieldCos.

31.     For example, on November 18, 2014, SunEdison announced the acquisition of First Wind LLC ("First Wind"). SunEdison, along with TERP, agreed to pay $2.4 billion for First Wind. SunEdison's share of the purchase was made up of a $1 billion upfront payment and $510 million to be paid out later in "earnout" payments as First Wind completed projects. As SunEdison later explained in a February 3, 2015 SEC filing, SunEdison funded its share of the upfront payments for First Wind in part through the sale of $337 million 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes"). SunEdison funded the remainder of its share of

payments through a $410 million two-year loan (the "Margin Loan") from lenders including Goldman Sachs Lending Partners LLC, Deutsche Bank AG, Barclays Bank plc and Morgan Stanley Bank, N.A.  Goldman Sachs Group, Inc. also served as a financial adviser on the deal.  As SunEdison later informed the Bankruptcy Court on April 22, 2016 in its Chapter 11 proceeding, "[t]he terms of the Margin Loan incurred in connection with the First Wind acquisition were integral to SunEdison's liquidity position."

32.     The Margin Loan contained provisions requiring prepayment or additional collateral to be posted under several circumstances that were dependent on the price of TERP common stock (the "Margin Loan Agreement").  First, if TERP's common stock price fell below a certain undisclosed price (the "TERP Stock Price Trigger") SunEdison would be required to prepay, in full, all outstanding indebtedness due on the loan the next business day.  Second, if the loan-to-value ratio of the collateral SunEdison offered as collateral relative to the total borrowings fell below an undisclosed level (the "Loan-To-Value Trigger"), SunEdison was required to either prepay the loan in full or provide additional cash collateral to bring the Loan-To-Value Trigger down to the permitted level by 5 p.m. on the second business day after the limit was exceeded.  According to the Margin Loan Agreement, SunEdison provided as collateral 32.2 million TERP shares, as well as additional incentive distribution rights interests in TERP that did not have a publicly disclosed market value.

33.     The TERP Stock Price Trigger and the Loan-To-Value Trigger were defined in a side letter agreement that was not publicly disclosed.  However, SunEdison's Form 10-Q filed with the SEC on May 7, 2015 stated that the Margin Loan Agreement required SunEdison to maintain a loan-to-value ratio not to exceed 50% – in other words, SunEdison had to post at least $2 in collateral for each $1 borrowed under the agreement.  Based only on the 32.2 million TERP shares originally pledged on the Margin Loan Agreement, the required ratio of 50%, and the $410 million loan balance, the Loan-To-Value Trigger would be exceeded if TERP's stock price declined to $25.24 per share.  At the time that the parties entered into the Margin Loan Agreement on January 29, 2015, TERP's stock price was $32.58 per share.

34.     Notably, both the Margin Loan and the Exchangeable Notes were misclassified in SunEdison's public filings and statements as "non-recourse" to SunEdison.   SunEdison also represented that its debt burden was manageable because (i) the debt financing for the projects SunEdison developed had only recourse to the specific projects themselves, and not to the parent Company, SunEdison, i.e., was "non-recourse" debt; and that (ii) SunEdison had dedicated cash flows for any "recourse" debt that it took on.   For example, in numerous investor presentations throughout the first six months of 2015, SunEdison provided a clear chart of "recourse" versus "non-recourse" loans, as set forth below in its Investor Presentation for its First Quarter 2015 conference call with investors, dated May 7, 2015, which included the Margin Loan and the Exchangeable Notes as "Non-Recourse Obligations" as indicated:

# SunEdison's Consolidated Debt Overview



**Recourse Obligations**
- $565mm Letter of Credit Facility*
- $492mm 2018 Convertible Senior Notes
- $438mm 2020 Convertible Senior Notes
- $435mm 2021 Convertible Senior Notes
- $334mm 2022 Convertible Senior Notes
- $8mm Pre-, Construction, and Term-debt
- $32mm Financing Leaseback Obligations
- $284 Other Credit Facilities

Total = $2,588mm

**Non- Recourse Obligations**
- → $410mm 2017 Margin Loan
- → $336mm 2020 Exchangeable Notes
- $150mm Acquisition Facility
- $366mm SMP Ltd. Credit Facility
- $2,056mm Pre-, Construction, and Term-debt
- $80mm Capital leaseback obligation
- $1,355mm Financing Leaseback
- $190mm Other Credit Facilities

Total = $4,943

35.     The distinction between recourse and non-recourse debt was critical to SunEdison. Given the fact that its non-recourse debt was twice that of its recourse debt, including the non-recourse debt in that ratio would have had a significant negative impact on SunEdison's ability to access liquidity through its credit facilities and fund its YieldCo projects.

36.     It was not until November 9, 2015—or months after the IPO—that the Margin Loan and the Exchangeable Notes began to be revealed as recourse obligations, although full information was not disclosed about them until several days later.

37.     By the time of entry into the Margin Loan and the issuance of the Exchangeable Notes or shortly thereafter, liquidity had already become a problem at SunEdison.  As SunEdison admitted to the Bankruptcy Court on April 22, 2016, it began to experience a "liquidity challenge" by no later than the spring of 2015.  Notwithstanding this "liquidity challenge," after the close of the First Wind acquisition, SunEdison announced a dizzying array of large-scale expensive projects it agreed to acquire in order to drop down the projects to TERP or Global.

38.     For example, on May 19, 2015, SunEdison entered into a share repurchase agreement with the shareholders of Latin America Power Holding, B.V. ("LAP") to acquire the shares of LAP. This transaction included, among other things, SunEdison acquiring six operating hydro-electric projects located in Peru.

39.     In June and July 2015 alone, SunEdison also purchased (or agreed to purchase) the following projects:

- On June 16, 2015, SunEdison announced it had signed an agreement to acquire Continuum Wind Energy Limited ("Continuum"), which owned 412 MW of wind power projects operating and under development in India and 1000 MW of wind projects under development elsewhere.

- Also on June 16, 2015, SunEdison announced that it would acquire Globeleq Mesoamerica Energy ("Globeleq"), owner of 405 MW of wind and solar projects operating or under development in Central America and 246 MW of wind projects under development globally.

- On June 25, 2015, SunEdison and TERP announced the acquisition of a 9 MW net ownership stake in a portfolio of operating and distributed solar power plants from Duke Energy Renewables, a commercial business unit of Duke Energy.

- On June 29, 2015, SunEdison announced that it had acquired 521 MW of wind power plants located in Idaho and Oklahoma from Atlantic Power and had formed a $525 million warehouse financing facility to hold the assets pending dropping them down to TERP.

- On July 1, 2015, SunEdison announced that it had secured financing and started construction on the Bingham Wind project in Maine, a 185 MW wind project.  The financing facility for the project was $360 million, and the total construction cost was estimated to be $420 million.

- On July 2, 2015, SunEdison announced that it had signed a memorandum of understanding with Gamesa, a wind turbine and wind farm manufacturer based out of

Spain, to develop up to 1 GW of wind power plants by 2018.   Under the memorandum of understanding, SunEdison would acquire the projects upon the start of construction and, once those projects were operational, would drop the projects down to TERP.

•      On July 6, 2015, SunEdison announced a $2 billion agreement to acquire 930 MW of wind power plants from Invenergy Wind LLC.

•      On July 15, 2015, Global entered into an agreement to acquire the rights to three wind and hydropower projects in Brazil from Renova Energia, S.A. ("Renova"), for cash and Global common stock upon the completion of Global's IPO.

•      On July 15, 2015 SunEdison announced the closing of its agreement to finance and deliver 50 MW of energy storage for Southern California Edison. Once operational, these projects were expected to be acquired by TERP.

•      On July 15, 2015, SunEdison completed the acquisition of Mark Group, a U.K. based solar panel installer, for $24 million in cash, plus deferred consideration of $14 million.

40.     As a result of the First Wind and ensuing acquisitions, in just six months, SunEdison's overall corporate debt increased rapidly from $7.2 billion at the end of 2014 to $10.7 billion by the end of the second quarter of 2015.

41.     Further, on July 20, 2015, SunEdison and TERP announced the acquisition of the residential rooftop solar company Vivint Solar ("Vivint") for $2.2 billion in cash and stock.  A press release explained that TERP would contribute the majority of the cash necessary to complete the Vivint transaction by purchasing from SunEdison a portion of the assets that it was acquiring from Vivint for $922 million.  However, in order to obtain the remainder of the cash needed for the transaction, SunEdison had to turn to Goldman Sachs Bank USA ("Goldman Sachs Bank") for a $500 million loan.  As set forth in the press release, the loan was made on a secured basis.

42.     The description of the financing required to acquire Vivint caused a negative market reaction, with some investors questioning SunEdison's capital-raising abilities going forward. Investors also negatively reacted to the fact that the residential solar portfolio held by Vivint was not compatible with SunEdison's existing business model targeting commercial and industrial projects. Accordingly, the price of both SunEdison and TERP shares declined significantly after the July 20,

2015 announcement of the deal.  Specifically with respect to TERP, on the day the Vivint acquisition was announced, its stock price declined from $37.20 per share to $34.90 per share, and continued decreasing in the following days as questions were raised about the acquisition, closing at $30.85 per share on July 24, 2015.

43.    At this point, however, and unknown to investors, TERP's stock price decline posed an imminent risk of triggering a margin call on the Margin Loan, which had previously been publicly characterized by SunEdison as non-recourse.  Thus, just prior to the Global IPO, with TERP's stock price declining, SunEdison had to find the funds to either prepay the loan in full or provide additional collateral.  As a result, SunEdison began negotiating with Goldman Sachs Bank to borrow a second lien loan of $169 million (the "Goldman Sachs Loan").  This loan would be at a rate of 9.25% with an origination fee of $9 million (5.3%), equating to an effective interest rate of 15%.  The effective 15% interest rate far exceeded the 2.68% weighted average annual interest rate of SunEdison's other debt reported in its second quarter 2015 Form 10-Q by nearly 500%.  These terms meant that SunEdison was so cash-poor that it would agree to pay Goldman Sachs Bank $25 million over the one-year life of the loan in just fees and interest in order to have access to the loan principle up front.  It was also a second lien loan because SunEdison did not have any assets that did not already have a first lien loan against them.  The loan was finalized on August 11, 2015, less than two weeks after the Global IPO, but was not disclosed until November 10, 2015.

44.    On August 7, 2015, just days after the closing of the Global IPO, TERP's stock price decreased to $25.24 per share, activating the Loan-To-Value Trigger under the Margin Loan.  Once the Loan-To-Value Trigger was activated, SunEdison was required to either prepay the loan in full or contribute additional collateral sufficient to bring the loan back into compliance by the second business day after the Loan-To-Value Trigger was exceeded.  SunEdison ended up posting additional collateral to the Margin Loan in the amount of $152 million, likely using the Goldman Sachs Loan to meet the requirement.

### *SunEdison's Liquidity and Cash Flow Difficulties Existed Months Earlier*

45.     Information concerning SunEdison's liquidity and cash flow problems was available upon reasonable investigation to those within SunEdison as early as the summer of 2014. SunEdison's projects required individualized construction and thus access to reliable vendors in highly specific fields.  As reflected in the hearing transcript, SunEdison's counsel explained to the Bankruptcy Court on April 22, 2016, when seeking payment for $357 million in then-outstanding vendor invoices:

> Each project requires customized design and engineering, not only for construction, but also for the components utilized in each project.  Vendors are generally not interchangeable, and the risk of nonpayment could delay construction, risking significant loss in the value for SunEdison stakeholders.

Thus, non-payment of vendors was a critical issue within SunEdison.

46.     According to an Amended Consolidated Securities Class Action Complaint originally filed against SunEdison, Chatila, and Wuebbels, *Horowitz v. SunEdison, Inc. et al.* in the United States District Court for the Eastern District of Missouri (the "*Horowitz* Complaint"), despite the vital and unique nature of SunEdison's vendors, from at least August 2014, SunEdison regularly delayed or failed to pay its vendors.  The *Horowitz* complaint alleges that SunEdison's former employees and vendors worldwide confirmed this practice.  These employees included the Project Coordinator & A/P Analyst who worked at SunEdison from May 2013 to May 2016 (the "Project Coordinator & A/P Analyst") and who had access to SunEdison's financial records and was directly involved in paying vendors and invoices.  She stated that SunEdison "never had cash" and she received calls from vendors demanding payment for unpaid invoices on a daily basis.  In order to pay vendors, the Project Coordinator & A/P Analyst constantly "had to beg" for money and fight with Zach Groves, SunEdison's Director of Finance.  In addition, according to a former Director of Global Financial Planning and Analysis at both SunEdison and TERP from August 2014 to May 2015 (the "Director of Global Financial Planning"), quoted in the *Horowitz* Complaint, SunEdison's liquidity problems existed from the beginning of his time with the Company and that SunEdison "owed everyone tons of money."

47.     Yet, despite the fact that SunEdison's financial health depended on maintaining a strong pipeline of new developments to drop down to the YieldCos, SunEdison's cash shortages were so severe that it placed that entire developmental model at risk by not paying business partners that were integral to acquiring new developments.  As alleged in the *Horowitz* complaint, a former Project Control and Procurement Manager at SunEdison from January 2015 to April 2016, (the "Project Control and Procurement Manager"), explained that in the middle of SunEdison's acquisition spree, it failed to pay the very company hired to do due diligence on its acquisitions.  The company, Garrad Hassan, known as "the world's largest wind-energy consulting group," was a crucial part of SunEdison's efforts to develop future projects.  However, in the summer of 2015, the Project Control and Procurement Manager learned that SunEdison was over one year overdue on an outstanding $1.5 million to Garrad Hassan.  Thus, when SunEdison solicited Garrad Hassan for additional work with an estimate of approximately $50,000, Garrad Hassan refused to work with SunEdison on any new acquisitions unless SunEdison paid 50% upfront.  In that case, a First Wind subsidiary, not SunEdison, ended up paying.

48.     The Individual Defendants in this case clearly had access to information about SunEdison's lack of cash and inability to timely pay its vendors.  The *Horowitz* Complaint alleges that according to a former Senior Internal Auditor at SunEdison from August 2014 to December 2015 (the "Senior Internal Auditor"), in April 2015, Defendant Wuebbels ordered an accounts payable audit (the "A/P Audit"). The Senior Internal Auditor was assigned to the A/P Audit by her supervisor, Martha Hernandez, SunEdison's Internal Audit Manager.  The Senior Internal Auditor discovered that the core underlying issue concerning SunEdison's inability to timely pay its vendor invoices was its cash flow limitations.  Thus, the Senior Internal Auditor also recommended to Hernandez to change the scope of the audit from an A/P examination to a cash flow audit. Management declined this recommendation, but the Senior Internal Auditor conducted her own informal investigation and discovered that SunEdison's revenues could not cover its liabilities and that "the company [would] die from that."

***The Global IPO Occurs Pursuant to a Materially False and Misleading Registration Statement and Prospectus***

49.     The Registration Statement, as amended, was declared effective on July 31, 2015. Defendants raised almost $1.5 billion in the IPO and a related bond offering, selling 45 million shares of Global common stock at $15 per share in the IPO for gross proceeds of $675 million and selling an additional $810 million of 9.75% bonds. Plaintiffs purchased their Global common stock pursuant to the Offering Documents.

50.     In the Offering Documents, Defendants painted SunEdison as a globally-established energy powerhouse with a long track record of completing asset acquisitions.  However, the Offering Documents were materially false and misleading because they failed to disclose SunEdison's precarious financial situation.  Specifically, it was drowning in unsustainable levels of debt, hemorrhaging cash and barely able to pay its vendors to sustain critical functions much less continue its acquisition spree, all of which would significantly hamper its ability to acquire and sell assets to Global or in any way allow Global to succeed in its business model.  Just two months after the IPO, SunEdison was forced to admit that it would not be selling any energy projects to Global in 2016 and was abandoning the YieldCo strategy.  Indeed, by April 21, 2016, only nine months after the Global IPO, SunEdison filed for bankruptcy.

51.     Moreover, at the time of the IPO, some of the same executives and bankers who were involved in the disaster that was unfolding at SunEdison were, in their capacities as officers and directors at Global or Underwriters of the IPO, trumpeting Global's bright prospects under the sponsorship of SunEdison.

52.     According to the Offering Documents, SunEdison was "the largest globally diversified developer of wind and solar energy projects in the world" having developed "over 1,300 solar and wind projects in 20 countries."  The Offering Documents further touted that SunEdison had "completed all of the projects on which it has commenced construction, including over 140 projects" in Global's target markets and had "a strong asset development pipeline and acquisition track record, significant project financing experience and asset management and operational expertise."

SunEdison's experience and viability was especially important to Global because SunEdison was to be its primary source of asset acquisitions.

53.     The Offering Documents set forth at length how Global would thrive based on its relationship with SunEdison.  Specifically, its stated that:

- We intend to rapidly expand and diversify our initial portfolio by acquiring…solar, wind and hydro-electric power generation assets located in our initial target markets, which we expect will also have long-term [power purchase agreements] with creditworthy counterparties.

- *We believe that we will be able to rapidly expand our initial portfolio as a result of the significant project acquisition call rights and rights of first offer, or "ROFO rights," that we have with our Sponsor* and the project acquisition call rights and ROFO rights we have and expect to acquire from third-party developers of clean power generation assets.  [Emphasis added].

- Immediately prior to the completion of this offering, *we will enter into a project support agreement, or the "Support Agreement" with our Sponsor, which will require our Sponsor to offer us additional qualifying projects from its development pipeline through the fifth anniversary of the completion of this offering that are projected to generate an aggregate of at least $1.4 billion of cash available for distribution* during the first twelve months following the qualifying projects' respective commercial operation dates… [Emphasis added].

54.     It was further stated in the Offering Documents that SunEdison would continue to supply Global with projects:

> We expect that our Sponsor will continue to provide us with the opportunity to aquire additional qualifying projects after it has satisfied its minimum commitment under the support agreement in order to maximize the value of its equity ownership and incentive distribution rights.  The support agreement with our Sponsor will also grant us ROFO rights with respect to additional clean energy projects that our Sponsor elects to sell or otherwise transfer and that are located in our initial target markets or other emerging markets that we mutually agreed upon.

55.     In Global's amended registration statement filed on July 20, 2015, it was asserted that Global would be a "high growth" company that would distribute 85% of its cash available for distribution ("CAFD") as dividends to investors, starting with an initial quarterly dividend of $0.275 per share ($1.10 per year) and growing its dividends by a 20% compound annual growth rate

("CAGR") based on the strength of SunEdison's liquidity and capital resources and its ability to continuously acquire, develop and construct renewable energy projects to add to Global's portfolio.

56.     These statements were false and misleading because by the time of the IPO, SunEdison was facing significant capital constraints on, and "liquidity challenges" to, its ability to finance new projects for sale to Global.  Without new projects to acquire, Global could not obtain anywhere near the level of revenue streams and projected growth rate it would require to pay reliable and growing dividends to its investors.

57.     The Offering Documents repeatedly emphasized the strength of SunEdison's business, Global's relationship with SunEdison and the resultant benefits that relationship would have for Global, including Global's "access to the significant resources of our Sponsor to support the high-growth strategy of our business." The Offering Documents further stated:

> **Relationship with SunEdison**. We believe our relationship with our Sponsor provides us with significant benefits, including the following:
>
> *Strong asset development track record*. Our Sponsor has demonstrated a significant track record in developing both solar and, as a result of its acquisition of First Wind, wind energy generation facilities. Over the last three calendar years, our Sponsor has constructed solar power generation assets with an aggregate capacity of 2.0 GW and, as of March 31, 2015, was constructing additional solar power generation assets expected to have an aggregate capacity of approximately 773.7 MW. Our Sponsor has been one of the top three developers and installers of solar energy facilities in the world in each of the past two years based on megawatts installed. Our Sponsor has developed over 1,300 solar and wind projects and has completed all of the projects on which it has commenced construction, including over 140 projects in our initial target markets. In addition, our Sponsor had a 7.5 GW pipeline of development stage solar and wind projects as of March 31, 2015, including 1.7 GW in our initial and future target markets. As of the same date, our Sponsor employed 3,400 people globally, of which over 1,900 were serving as developers and operators of renewable energy projects. Our Sponsor's operating history demonstrates its organic project development capabilities in our initial target markets. We believe our Sponsor's relationships, knowledge and employees will facilitate our ability to rapidly acquire operating projects from our Sponsor in our initial target markets.

*Yieldco experience.* Our Sponsor's subsidiary, TerraForm Power, which owns and operates clean power assets located in the United States and other select jurisdictions, completed its initial public offering in July 2014. With our Sponsor's support, TerraForm Power has raised approximately $3.9 billion in acquisition and permanent financing to pursue acquisitions of renewable energy projects totaling 1,703.0 MW as of May 1, 2015.

*Proven acquisition expertise.* In 2014, our Sponsor completed 32 corporate and project acquisitions worldwide, which included operating projects with an aggregate nameplate capacity of 1.5 GW. In addition, our Sponsor, through TerraForm Power, completed the acquisition on January 29, 2015 of First Wind's 500.0 MW of operating wind generation assets and 21.1 MW of operating solar generation assets and 1.66 GW of wind and solar generation assets under development. These acquisitions include two wholly owned subsidiaries of I-Ioniton, which provides our Sponsor with an operating and maintenance platform in China. Additionally, our Sponsor's pending acquisition of LAP will provide it with a hydroelectric development pipeline in Peru and an operations and maintenance platform in Latin America. We believe our Sponsor's significant acquisition experience and expertise will enable us to expand our portfolio through additional acquisitions of operating projects from unaffiliated third parties in our initial target markets. Our initial portfolio includes two projects that we have acquired from third parties. Concurrently with this offering or, in certain cases, during the remainder of 2015, we expect to complete seven separate transactions to acquire projects included in our initial portfolio, expanding our geographic footprint and diversifying our renewable energy technologies.

*Project financing experience.* We believe our Sponsor has demonstrated a successful track record of sourcing long-term capital to fund project acquisitions and the development and construction of projects located in our initial target markets. To date, our Sponsor has raised an aggregate of $3.3 billion since January 1, 2014 to support its development and acquisition activities. We expect that we will realize significant benefits from our Sponsor's financing and structuring expertise as well as its relationships with financial institutions and other providers of capital.

*Asset management expertise.* We will have access to the significant resources of our Sponsor to support the high-growth strategy of our business. As of March 31, 2015, our Sponsor had over 4.9 GW of projects under management across 20 countries. Approximately

16.1% of these projects are third-party power generation facilities, demonstrating our Sponsor's collaboration with multiple developers and owners. These projects utilize 29 different module types and inverters from 17 different manufacturers. As of March 31, 2015, our Sponsor had approximately 700 employees servicing operations and management in our initial target markets. In addition, our Sponsor maintains three renewable energy operation centers to service assets under management. Our Sponsor's asset management experience helps ensure that our facilities will be monitored and maintained to maximize cash generation. We also benefit from First Wind's asset management expertise as the First Wind team has been integrated with our Sponsor.

58.     The Offering Documents also advertised SunEdison's success with TERP, which it took public in 2014, its M&A experience, and how such experience would be further beneficial to Global.  Specifically, it stated:

- Our Sponsor has significant experience in acquiring, financing and operating clean power generation assets through a publicly listed dividend-oriented company. We will be the second yieldco vehicle to launch with our Sponsor's support. . . . *We intend to capitalize on our Sponsor's experience in successfully launching and supporting TerraForm Power.*

- … *We expect to continue to leverage our Sponsor's significant development expertise, project pipeline and third-party acquisition track record.*  For example, we have completed or expect to complete in connection with the closing of this offering or during the remainder of 2015, nine separate acquisitions representing 1.1 GW in the aggregate of projects located across multiple geographies that utilize a variety of renewable energy technologies. [Emphasis added].

- To date, our Sponsor and TerraForm Power have raised an aggregate of $9.4 billion since January 1, 2014, providing them with the capital necessary to acquire projects and development platforms to grow TerraForm Power's portfolio of operational renewable energy projects in mature markets.

- Under the Management Services Agreement, our Sponsor has committed to provide us with a team of experienced professionals to serve as our executive officers and other key officers. We expect that certain of these professionals will provide such services to us on a dedicated basis. Our officers have considerable experience in developing, acquiring and operating clean power generation assets, with an average of over five years of experience in the sector. Mr. Domenech, our Chief Executive Officer, and his team have been successful in expanding TerraForm Power's project portfolio from 807.7

MW as of its initial public offering in July 2014 to 1,703.0 MW as of May 1, 2015, an increase of 111%.

59.     The above statements from the Offering Documents were misleading because by the time of the IPO, SunEdison was not in the financial condition to continue its acquisition strategy at this rate or replicate what it had done with its other YieldCo, TERP.  The Offering Documents failed to explain that SunEdison was experiencing significant "liquidity challenges" in early 2015, after the First Wind acquisition, the nature of the debt SunEdison had taken on (recourse versus non-recourse), that SunEdison was on the verge of a margin call on the Margin Loan, and the fact that SunEdison's liquidity situation was so poor that it had to take out the Goldman Sachs Loan at a punitive 15% interest rate.

60.     In discussing SunEdison's merger and acquisition strategy, the Offering Documents also explained that SunEdison would be acquiring hydro-electric development assets from LAP. Using this example, the Offering Documents declared that "we believe our Sponsor's significant acquisition experience and expertise will enable us to expand our portfolio through additional acquisitions of operating projects from unaffiliated third parties in our initial target markets."  These statements were false and misleading because they failed to disclose that SunEdison lacked the funding to close this transaction and others like it or to acquire the other projects on Global's call rights list or to carry out its obligations under the support agreement with Global to offer or provide Global, within five years of the IPO, projects that would generate an aggregate of $1.4 billion in CAFD during their first year of operation.  As would soon be revealed, SunEdison would fail to make the required upfront payment to purchase the LAP assets.

61.     In sum, the Offering Documents contained untrue statements of material fact and/or omitted other material facts necessary to make the statements made therein not misleading, including:

(a)     that SunEdison had already in July agreed with Goldman Sachs Bank to structure the Goldman Sachs Loan, reflecting SunEdison's increasingly desperate liquidity situation;

(b)      that the debt covenants in the Margin Loan had been breached, or were in imminent danger of being breached;

(c)      that SunEdison lacked sufficient cash to meet the operating needs of its business and thereby;

(d)      that SunEdison lacked sufficient liquidity to acquire the projects that were to form Global's initial start-up portfolio and therefore Global was going to benefit from its relationship with SunEdison, and SunEdison had insufficient liquidity to support Global's high growth strategy or permit the rapid expansion of its business;

(e)      that because of SunEdison's liquidity problems and its existing financial obligations and commitments, there was no reasonable basis to believe that SunEdison would have the liquidity needed to acquire, develop and construct the projects on Global's call rights list that needed to be dropped down in order to permit Global to realize its forecast MW growth or to do so at a cost that would permit Global to meet its CAFD or dividends per share ("DPS") growth forecasts;

(f)      that SunEdison lacked the ability to carry out its obligations to Global under the support agreement to offer or provide, within five years of the IPO, projects that would generate an aggregate of $1.4 billion in CAFD during their first year of operation;

(g)      that because of the facts alleged above, the Defendants had no reasonable basis for Global's MW, CAFD or dividend growth forecasts, the representations about SunEdison's financial strength or Global's ability to benefit from its relationship with SunEdison; and

(h)      that even where the Offering Documents purported to warn investors of risks to Global's success, those "risk disclosures" were themselves misleading as they described the risks as contingent on uncertain future events when, in fact, the events warned of had already occurred.

62.      The Offering Documents were also materially false and misleading because they omitted, in violation of the rules and regulations governing registration statements, to disclose

known trends, demands, commitments, events or uncertainties that might affect a registrant's liquidity, capital resources, or results of operations in any material way. Because Global was heavily dependent upon SunEdison to effectuate its business model, the precariousness of SunEdison's financial condition and the waning viability of the YieldCo model were required to be disclosed in the Offering Documents. Defendants failed to disclose and/or failed to cause such facts to be disclosed, including the trends regarding SunEdison's liquidity and capital resources and, therefore, the liquidity and capital resources that would be available to Global.

63.     The Offering Documents stated that Global's financial practices (which were wholly dependent upon and operated by SunEdison under the Management Services Agreement) included "financing policy focused on achieving an optimal capital structure through various capital formation alternatives to minimize interest rates, refinancing risks and tax withholdings." This statement was materially false and misleading in that it failed to disclose that SunEdison had already violated that policy by structuring an agreement to borrow funds from Goldman Sachs Bank at an exorbitant interest rate (the Goldman Sachs Loan) and had breached or was about to breach another agreement (the Margin Loan) in a manner that gave rise to a significant risk that the agreement would have to be refinanced, which it ultimately was.

64.     The Offering Documents also misled investors by warning of conditions that might harm Global's business if they arose in the future, when, in fact, those conditions had already manifested, resulting in current conditions then impacting Global at the time of the IPO, as opposed to the purportedly contingent future risks that the Offering Documents represented.

72.     For example, the Offering Documents stated:

> Any significant disruption in the credit or capital markets, or a
> significant increase in interest rates, could make it difficult for our
> Sponsor or other development companies to successfully develop
> attractive projects and may also limit their ability to obtain project-level
> financing to complete the construction of projects we may seek
> to acquire. It could also adversely affect our ability to fund
> acquisitions and/or operating costs. If our Sponsor or other
> development companies from which we seek to acquire projects are
> unable to raise funds when needed, or if we or they are unable to

> secure adequate financing, the ability to grow our project portfolio
> may be limited, which could have a material adverse effect on our
> ability to implement our growth strategy and, ultimately, our
> business, financial condition, results of operations and cash flows.

73.     This purported "risk disclosure" was materially false and misleading. The true

facts were that SunEdison's borrowing costs had already increased dramatically, as evidenced by

the undisclosed Goldman Sachs Loan. Thus, at the time of the IPO, SunEdison already lacked

the ability to successfully develop projects with project level financing that permitted it to

complete the construction of such projects on terms and at a cost that would permit Global to

implement its growth strategy without adversely affecting its business, financial conditions,

results of operations and cash flows. Similarly, the failure to disclose the actual or imminent

breach of the Margin Loan shows that the risks described as contingent in the Offering

Documents had already manifested at the time of the IPO.

74.     In the Offering Documents, Defendants "forecast that our cash available for

distribution during the twelve months ending June 30, 2016 and December 31, 2016 will be

approximately $195.8 million and $231.5 million, respectively, of which we forecast $110.3 will

be distributed" as dividends, and that this would be sufficient to pay Global's annual dividend of

$1.10. The Offering Documents further asserted that: (i) Global "ha[d] a reasonable basis for

these assumptions and that our actual results of operations will approximate those reflected in

our forecast"; (ii) "for purposes of our forecast, we have assumed that no unexpected risks will

materialize during the forecast periods"; and (iii) based on Global's ability to expand its project

portfolio through the projects on the SunEdison call rights list, Global could reasonably be

expected to achieve a 20% CAGR in the dividends paid to investors over the first three years of

its life. The Offering Documents also stated:

> We intend to target a 20% CAGR in dividends per share over the three-year period following the completion of this offering. This target is based on, and supported by, our Sponsor's $1.4 billion aggregate Projected FTM CAFD commitment to us under the Support Agreement and our Sponsor's track record of successful project acquisitions from unaffiliated third parties, which will provide us the opportunity to grow our CAFD following this offering.

75.     The foregoing statements were materially misleading because there was no reasonable basis for the assumption that the projects on Global's call rights list could be acquired on terms that would support the forecast CAFD or DPS growth, or at all in light of SunEdison's deteriorating liquidity condition. By the time of the IPO, undisclosed conditions had already materialized that threatened the ability to acquire or complete the projects on Global's call rights list or achieve its long-term growth forecasts.  Specifically, the debt covenants on the Margin Loan were dangerously close to the level that would cause them to be breached (if a breach had not already occurred), and SunEdison lacked the liquidity to acquire and develop some of the projects on Global's call rights list, including projects from LAP, Continuum, Globeleq and Renova.

76.     The Offering Documents included descriptions of Global's initial project portfolio and the projects on its call rights list with SunEdison, stating that by the end of 2015, Global's initial project portfolio would consist of 1,406 MW of capacity. The Offering Documents also included a "risk disclosure" noting that some of those acquisitions could be delayed if the transactions did not receive government approval or if construction was not completed so that the plants were placed into commercial operation by the end of the year, stating:

> With the exception of five projects representing an aggregate of 128.2 MW, all of the Sponsor contributed projects included in our initial portfolio have reached their COD. We expect the remaining

five projects to reach COD before the end of 2015. Our initial portfolio includes the Pending Acquisitions representing 921.7 MW that we expect to close concurrently with the completion of this offering or during the remainder of 2015. The Pending Acquisitions include three non-operational projects representing an aggregate of 158.4 MW. Our acquisition of these projects is subject to their reaching COD, which we expect to occur before the end of 2015. However, we cannot assure you that all of the projects in the Pending Acquisitions that are to be acquired upon reaching COD will achieve COD on the currently anticipated timelines or at all, or that any of the Pending Acquisitions that are expected to close after the consummation of this offering will close on the currently anticipated timelines or at all. Because the forecasted CAFD presented in this prospectus is based upon assumptions regarding the size of our portfolio and the timing of the consummation of the Pending Acquisitions (which, in certain cases, depends upon the timing of projects under construction reaching COD), our actual CAFD for the forecast periods could be smaller than the forecasted CAFD. See "Risk factors - Risks related to our business - There can be no assurance that the Pending Acquisitions will be consummated on the timetable currently anticipated, and the closing of this offering is not conditioned on the consummation of these acquisitions" and "— Our forecasted and unaudited pro forma financial information assumes the completion of all of the Pending Acquisitions."

77.     The foregoing "risk disclosure" omitted material facts necessary to make the statements made therein not misleading, including that at the time of the IPO, SunEdison lacked sufficient liquidity to acquire the projects for Global's call rights list needed to support the forecast growth, such as the LAP, Renova and Continuum acquisitions. SunEdison's cancellation of these acquisitions, which included projects for Global's start-up project portfolio and call rights list, further confirms that SunEdison lacked the liquidity to fund the commencement of Global's operations. The foregoing statement also was materially false and misleading in that it indicated that the principal risks to Global's start up were external delays (i.e., in permitting, construction or government approvals), whereas the true, and undisclosed, "risk" was that neither

Global nor SunEdison had available or had access to the financing necessary to acquire those projects in the timeframes represented.

### *The Truth Concerning SunEdison's Financial Difficulties Begins to Leak Out Following the Global IPO*

78.     On August 6, 2015, two days after the closure of Global's IPO, SunEdison announced troubling second quarter 2015 financial results, reporting a loss of $263 million on $455 million of revenue.  It had a net loss of $0.93 per share compared to estimates of a net loss of $0.55 per share. According to its financials, SunEdison's debt now stood at approximately $11 billion, which included debt from several recent multi-billion dollar deals to acquire new wind and solar assets.

79.     *The Motley Fool* published an article that day entitled "SunEdison's Losses Become a Red Flag for Investors."  The article noted that "[i]n a quarter when its competitors wowed investors with better than expected profits, SunEdison is plunging."  It further opined that "these results highlight how tough it's going to be to build a renewable energy powerhouse with nearly $11 billion in debt and negative cash flow from operations. The market is finally starting to realize that this high-profile renewable energy powerhouse may actually be building a house of cards."

80.     In response to these disclosures, on August 6, 2015 the price of Global's stock fell $2.23 per share from an open of $13.50 per share to a close of $11.27 per share, representing an almost 17% drop in value.

81.     Also on August 6, 2015, Cowen and Company ("Cowen") issued a report on SunEdison.  Reflecting the market's belief at the time about the nature of SunEdison's debt, while commenting on SunEdison's total consolidated debt of more than $10 billion, Cowen noted that 75% of SunEdison's debt was non-recourse.   However, as later revealed, the claim that 75% of SunEdison's debt was non-recourse was grossly inaccurate.

82.     On August 11, 2015, the *St. Louis Post-Dispatch* published an article discussing SunEdison's second quarter loss entitled "SunEdison Gets Caught in Energy Downdraft."  The article noted that SunEdison's acquisition-heavy business model was at risk given the already large debt held by the company.  It reported that when SunEdison had announced the Vivint acquisition,

SunEdison stated that it would issue TERP shares to pay for the deal.  However, after TERP's stock price declined, SunEdison had to finance the deal with debt instead.  Given the amount of debt SunEdison already had, the article stated that "borrowing more will make it a riskier company." However, SunEdison had to continue to acquire and develop projects to keep dividends growing at Global (and TERP).  David Carter, an analyst at Terril & Co., stated in the article, "The bigger they get, the more they need to feed the beast . . . . They do need continual access to capital to keep it growing, and that's a risk."

83.     Also on August 11, 2015, the financial news site *SeekingAlpha* published an article questioning SunEdison's business model and describing SunEdison's net losses as "whopping."  The article stated: "As debt has been one of the primary reasons for solar bankruptcies over the past decade, growth may become irrelevant if the company's losses keep piling up.  With debt levels starting to surpass the double digit billions, SunEdison is clearly one of the riskier solar plays. . . . the risks associated with this stock are only rising."  The article further stated that SunEdison's strategy had enormous downsides and that it might have been be consolidating the supply chain far too fast.  Due to uncontrollable debt levels, its stock price could crumble.  As the article noted: "should SunEdison's debt spin out of control, the company's lofty ambitions could easily come crashing down."

84.     In response to this news, on August 11, 2015, the price of Global's stock declined $1.30 per share from $11.79 per share to a closing price of $10.49 per share.

85.     A follow up article in *The Motley Fool* on August 24, 2015 entitled "SunEdison's House of Cards Is Starting to Crumble" noted that SunEdison "doesn't have the balance sheet to build projects" because it had significantly more debt than uncommitted cash.

86.     Further casting doubt on the future success of SunEdison's project acquisitions, on August 25, 2015, the Indian newspaper MINT reported that a planned joint venture between SunEdison and Adani Enterprises for a $4 billion photovoltaic manufacturing facility was at risk because the partnership was "not working out" according to an anonymous source.

87.     Also on August 25, 2015, UBS issued an analyst report disclosing that a margin call had been made on the Margin Loan.  This news caused UBS to downgrade SunEdison stock, calling it a "falling knife."   Because Global's fortunes were inextricably tied to those of SunEdison, Global's stock dropped concomitantly on this news, decreasing from $9.46 per share to a closing price of $8.04 per share on August 25, 2015.

88.     On September 27, 2015, an article in *The Motley Fool* titled "Once a Hedge Fund Favorite, SunEdison Has a Long Climb Out of Its Current Hole," explained that: "In an act of desperation, SunEdison has created what it calls 'warehouse vehicles' which will house projects until [Global or TERP] can buy them."  These vehicles would be funded by debt and equity, but, according to the article, "the cost is much higher than SunEdison would like."  On the next trading day, September 28, 2015, the price of Global stock dropped from an open of $7.91 per share to a close of $7.13 per share, a nearly 10% loss.

89.     Additional negative analysis of SunEdison's predicament followed.  For example, in a piece from *Zach's Equity Research* dated September 30, 2015, the publisher noted that SunEdison had been on "an acquisition spree since last year."  While this move was "once believed to be strategic," it was now "considered ineffective as SunEdison does not have the financial strength to fund the projects."  Specifically, according to the article, SunEdison now had debt outstanding of $10.7 billion, nearly double the $5.4 billion it had outstanding a year earlier, with a concomitant near-doubling of its interest expenses.

90.     The revelations continued after the close of trading on October 5, 2015, when SunEdison filed a Form 8-K with the SEC, announcing layoffs of 15% of its workforce and restructuring charges of $30 to $40 million for Q3 2015 through Q1 2016.

91.     On October 6, 2015, *The Wall Street Journal* reported that as its "woes mount[ed]," SunEdison failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition of LAP, and LAP walked away from the sale.  According to attorneys for LAP, SunEdison was in breach of its obligations under the deal.  On this news, Global stock decreased

again, declining from an opening price of $7.06 per share to a closing price of $6.68 per share on October 6, 2015.

92.   On October 7, 2015, SunEdison lowered its 2016 projections and announced that it would not sell any projects to Global or its other YieldCo that year.  SunEdison's CEO, Defendant Chatila, announced on a call with analysts that SunEdison would "pivot to third-party sales" because there was "a disconnect between the value of these underlying assets and what people are willing to pay for them in a yieldco."   Even worse, Chatila announced that SunEdison planned to reduce expansion plans in Latin America and other emerging markets, which were Global's geographic focus.   Chatila explained that SunEdison "de-emphasized countries, consolidated divisions and walked away from things that didn't make sense in the current dislocation in the market."   In other words, the project acquisition strategy upon which Global depended to effectuate its business plan would not be carried out.

93.   The drop in Global's equity value that occurred as the truth was revealed to the market compounded Global's problems even further, as equity financing would no longer be a reliable basis for the YieldCo to fund acquisitions, whether from SunEdison or elsewhere.  Indeed, an October 7, 2015 *Bloomberg Business* article quoted Chatila as announcing that, with the share prices of Global and TERP down, the two YieldCos were no longer in a position to purchase power plants.  According to the writer, SunEdison would have to look for outside buyers or instead hold the projects on SunEdison's balance sheet.   This was "the latest sign that this model, known as YieldCos, [was] falling from favor in the renewable energy industry."   SunEdison subsequently admitted that a $152 million margin call had been made on the Margin Loan because the price of TERP's shares had declined.

94.   On October 8, 2015, *SeekingAlpha* issued an article entitled "SunEdison: Is Bankruptcy Possible," stating that SunEdison's cash expenditures were "clearly unsustainable" with the Company burning "around $3.5 billion in the last four quarters." The article also noted that "SunEdison is over-leveraged" with "shareholders['] equity of only $632 million and total liabilities of $16,925 million, it is possible to calculate a debt to equity ratio of 26.78."

95.     On November 9, 2015, after the market closed, SunEdison filed its 3Q 2015 Form10-Q with the SEC and revealed the Goldman Sachs Loan.  It also: (i) revealed that SunEdison had been required to deposit an additional $91 million in cash collateral on the Margin Loan in October 2015 (over and above the $152 million margin call that was revealed on October 7, 2015); and (ii) reclassified the $740 million of debt under the Margin Loan and Exchangeable Notes as recourse debt, thereby admitting it previously mis-classified the debt as non-recourse.

96.     On November 10, 2015, the next trading day after the disclosures in the above paragraph, Global's stock price declined from an opening price of $7.77 per share to a close of $7.22 per share.

97.     The negative news continued to flood in.  Also on November 10, 2015, Reuters reported in an article titled "SunEdison shares slide 24 percent on liquidity fears," that:

> The company also said it would stop selling projects to its two "yieldcos" - bundles of solar, wind or other power assets it spun off into dividend-paying public entities.
>
> The yieldcos had become an important source of funding for SunEdison. The solar industry bellwether said in its quarterly report on Monday that there were no assurances it would be able to raise the $6.5 billion to $8.8 billion needed to fund the construction of renewable energy assets through 2016.

98.     The following day, on November 11, 2015, *Business Insider* in an article titled "SunEdison is getting obliterated," reported that:

> Renewable energy firm SunEdison is down 14% after the company disclosed a number of cash commitments in its quarterly earnings report.
>
> Here are the details:

- According to an agreement SunEdison made in September, it has bought $100 million worth of TerraForm Global stock from one of its partners, Renova, in March 2016 [*sic*]. TerraForm Global is down 4.2%.

- It also may have to buy $4 billion worth of wind-farm projects from Renova.

- Meanwhile, another SunEdison affiliate, TerraForm Power, could be required to buy 450 megawatts of completed Vivint projects in 2016, and up to 500 megawatts per year from 2017 to 2020 from SunEdison.

> - TerraForm Power is also obligated to pay $580.3 million of assets for some residential projects. TerraForm Power is down 4.3%.

That's a lot of cash.

99.     On November 13, 2015, UBS issued a report on SunEdison.  Among other things, USB mentioned in the report that $410 million for the Margin Loan and the Exchangeable Notes were shifted by management to recourse obligations in the third quarter slide deck from non-recourse in the second quarter slide deck.  UBS provided no explanation for the shift.

100.    Also on November 13, 2015, Global filed its third quarter 2015 Form 10-Q with the SEC (the "3Q 2015 10-Q").  Among other things, the 3Q 2015 10-Q disclosed that LAP requested arbitration in connection with the failed transaction between SunEdison and LAP, claiming that SunEdison and its affiliates (not Global) breached the agreement and requested damages in an amount not less than $150 million.

101.    On November 17, 2015, the research firm CreditSights reported that SunEdison had reclassified $739 million in debt from non-recourse to recourse debt, thus giving lenders access to more collateral.  As set forth above, SunEdison's prior reporting of large amounts of debt as non-recourse made it appear more liquid, so this reclassification caused a further decline in its stock price.  Global's stock price also decreased on this news, closing at $5.92 per share, down from an opening price of $6.77 per share.

102.    On November 18, 2015, Deutsche Bank issued a company update report on SunEdison after hosting an investor meeting with SunEdison management.  The first topic and the first item listed among a group of the top investor questions concerned why debt was re-classified from non-recourse to recourse.  The report stated (emphasis added):

> For the $410m margin loan, SUNE had to post cash collateral in Q3 due to the sharp decline in TERP shares.  ***Because of this cash trigger the company had to reclassify the loan from non-recourse to recourse.*** The interest payment on $337m exchangeable notes was always SUNE's obligation and the classification as non-recourse in prior quarter was due to clerical error.

103.     Also on November 18, 2015, J.P. Morgan issued a report on SunEdison on various concerns about SunEdison.  Among other things, J.P. Morgan stated that investors were concerned that another margin call on the $410 million Margin Loan might be triggered.

104.     On November 19, 2015, before the market opened, it was reported by *TheStreet.com* that the Blackstone Group denied rumors that it would invest in SunEdison.  SunEdison's stock price had increased the prior day on the rumors that a Blackstone Group investment could help support its debt load.  *TheStreet.com* rated SunEdison as a "sell" with a ratings score of D+.  As it stated: "[SunEdison's] weaknesses can be seen in multiple areas, such as its generally high debt management risk, generally disappointing historical performance in the stock itself and feeble growth in its earnings per share."  On this news, on November 19, 2015, Global stock decreased from an opening price of $5.20 per share to a closing price of $4.76 per share.

105.     Also on November 19, 2015, *Real Money* reported in an article about SunEdison titled "Will Troubled SunEdison Need to Raise More Equity?" that analysts had concerns about its liquidity.  As Doug Kass of Seabreeze Partners Management stated:  "There's an absence of transparency in their financials" referring to SunEdison's sales figures as well as the Goldman Sachs Loan.  The article reiterated that when the Blackstone rumors proved to be untrue, SunEdison's stock declined.

106.     On November 23, 2015, SunEdison, TERP and Global announced a series of management and Board member changes.  Defendant Wuebbels, who was then the CFO of SunEdison, was becoming the CEO of TERP and Global.  Rebecca Cranna, formerly CFO of SunEdison's Global Asset Management, was appointed as CFO of TERP and Global.  They were replacing Carlos Domenech and Alenjandro Hernandez, reprectively, who were departing. SunEdison also appointed three new members to Global's Board of Directors.  On this news, Global's stock price increased from $5.10 per share to a closing price of $5.43 per share.

107.     Also on November 23, 2015, Moody's Investors Service announced that it had downgraded Global's credit rating and issued a negative ratings outlook on the company to "reflect

the strained liquidity and financial situation at parent Sun Edison" and the "the liquidity stress at and contagion risks from [SunEdison]."

108.    On November 25, 2015, DealStreetAsia reported that SunEdison was calling off its deal to acquire Singapore-based Continuum Wind and would slow down global acquisitions "amid liquidity constraints." On this news, Global's stock fell from an opening price of $5.19 per share to a closing price of $4.11 per share.

109.    On December 2, 2015, Global and SunEdison announced the termination of the Renova acquisition.

110.    On January 7, 2016, SunEdison announced a series of complex financing transactions to improve its near-term liquidity crisis, paying an effective debt cost of more than 20% and diluting shareholder interests by at least 21% to raise funds it needed. On this news, Global's stock price decreased from an opening price of $5.12 per share to a closing price of $4.74 per share.

111.    Rather than alleviate concerns, following SunEdison's restructuring announced on January 7, 2016, financial analysts were skeptical about SunEdison's liquidity, debt and ability to raise funds. As stated on January 8, 2016 by *Zacks Equity Research*, SunEdison's annual interest expenses will increase by about $40 million because of the restructuring.

112.    On January 9, 2016, *The Motley Fool* in an article titled "SunEdison Inc's Digging a Hole It May Never Get Out Of," stated (emphasis added):

> A move to reduce debt may tell us more about how much trouble SunEdison Inc is in than anything else.

> *            *            *

> According to analyst Sven Eenmaa at Stifel Financial Corp., the exchange offer made on Thursday will actually increase interest expense annually by about $40 million because it exchanged low interest rate convertible debt for higher interest rate term debt. With this included, SunEdison's interest costs are about $276 million per year.

> *            *            *

. . . The real problems start to emerge when you start looking at its future cost of debt.

…the $725 million term loans announced yesterday came with interest rates of LIBOR + 10%, or about 10.85% as of today at 6- month LIBOR rates.

***That's an insanely high interest rate compared to competitors*** like First Solar and SunPower, who are paying LIBOR plus 3.5% or less on short-term debt. Not only does that mean interest costs may be increasing further in the future, it make it harder for SunEdison to build projects with competitive financing structures versus competitors.

\*       \*       \*

The general theme here is that SunEdison's business is moving toward the lower-margin business of selling projects to third parties at the same time its borrowing costs are trending higher. That's a slippery slope for any business, and it doesn't bode well for SunEdison, especially when it's competing against companies with much lower cost structures.

113.    The negative news about SunEdison continued on January 12, 2016, when *The Motley Fool* in an article titled "Why SunEdison Inc's Shares Dropped Another 29% Today," stated:

Analyst Gordon Johnson at Axiom Capital Management raised more concerns about the company's recent debt restructuring. Details of that restructuring can be seen here, but the short story is that SunEdison traded debt for a combination of equity and new debt that actually holds a higher interest payment than the old debt.

\*       \*       \*

**Now what**: SunEdison has been in a downward spiral and it's a situation that will be almost impossible to get out of at this point. The company needs low cost funding to build projects and needs new projects to pay for debt already on the balance sheet. With both  working against  the company there's  not  a likely scenario where  it can get enough funding to dig out of its current hole. For investors, the risk of bankruptcy sometime in the next year is too big to ignore and I see no reason to buy the stock now.

114.    From January 7, 2016, when SunEdison announced its debt restructuring through January 12, 2016, Global's stock price decreased, going from an opening price of $5.12 per share on January 7th to a closing price of $3.78 per share on January 12, 2016.

115.     On February 29, 2016, SunEdison announced that it cannot timely file its 2015 Form 10-K with the SEC because of its Audit Committee's investigations into the accuracy of its financial position.  That investigation was stated to have begun in late 2015.

116.     On March 30, 2016, Global filed a Form 12b-25 with the SEC stating that it could not timely file its 2015 Form 10-K with the SEC without unreasonable effort and expense.

117.     SunEdison's financial condition continued to deteriorate, leading it to file for Chapter 11 Bankruptcy on April 21, 2016.  On that date, Global's stock price closed at $2.99 per share.

### ***Defendants Did Not Make the Required Investigation to Ensure That the Offering Documents Did Not Contain Materially False and Misleading Statements or Ignored the Results of That Investigation***

118.     Neither the Individual Defendants nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

119.     Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to a company's non-public information. Underwriters must not rely on management statements; instead, they need to play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

120.    Had the Individual Defendants and Underwriter Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

121.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding SunEdison's financial ability to serve as the backbone for Global's business model and propel its acquisitions and growth.  Goldman Sachs' failure to conduct a reasonable investigation is particularly egregious, given the lending relationship its affiliate had with SunEdison and thereby its access to knowledge of SunEdison's severe liquidity and debt problems.

122.    Similarly, the Individual Defendants who signed the Registration Statement failed to conduct a reasonable investigation of the statements contained in the Offering Documents and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.  Because every single one of the Individual Defendants held dual roles between SunEdison and Global, they were in a position to know of, and/or had access to information concerning, the liquidity and debt problems rampant at SunEdison and at near crisis levels by the time of the Global IPO.

123.    The Individual Defendants and Underwriter Defendants were sophisticated in financing issues given their collective industry experience and yet failed to reasonably inquire about or ignored SunEdison's liquidity issues as they pertained to Global, notwithstanding the existence of numerous events to which they should have inquired, including the SunEdison's historic failure to

timely pay its vendors, the 2015 A/P audit, the Margin Loan, and the Goldman Sachs Loan, all of which had occurred prior to or concurrent with the IPO.

## CLASS ACTION ALLEGATIONS

124.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased shares of common stock of Global pursuant to and/or traceable to the IPO (the "Class") and were damaged thereby.  Excluded from the Class are Defendants, SunEdison, the officers and directors of the Company and/or SunEdison, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

125.    Global sold 45 million shares of common stock in the IPO.  The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Global or its transfer agent or the Underwriters.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

126.    Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

128.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

129.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Offering Documents issued by Defendants to the investing public in connection with the IPO omitted and/or misrepresented material facts about Global and its business; and

(c)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against Global, the Individual Defendants,
### and the Underwriter Defendants

130.     Plaintiffs repeat and reallege each and every allegation contained above.

131.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This Count is not alleging fraud or intentional conduct or recklessness.

132.     Plaintiffs acquired common stock of Global pursuant to the Offering Documents.

133.     The Registration Statement and the Prospectus incorporated therein were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

134.     Specifically, and as set forth above in more detail, the Offering Documents painted Global's sponsor SunEdison as a highly-reliable future source of power generation asset

acquisitions, which acquisitions were essential to Global's business model, when in fact SunEdison was in no financial position to carry out this strategy.

135.    Global is the registrant for the IPO.  As issuer of the common stock, Global is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

136.    The Individual Defendants each signed the Registration Statement.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

137.    The Underwriter Defendants each served as underwriters in connection with the IPO. Thus, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

138.    Neither the Individual Defendants nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts necessary to make such statements not misleading.

139.    At the time they acquired their shares of Global common stock, Plaintiffs were without knowledge of the material misstatements and omissions set forth above.

140.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

141.    By virtue of these violations, Plaintiffs and the other members of the Class have sustained damages.  The value of the common stock of Global has declined substantially subsequent to the IPO and due to Defendants' violations.

142.    Less than one year has elapsed from the time that Plaintiffs discovered the facts upon which this complaint is based to the time that Plaintiffs filed the initial Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this Complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

143.     Plaintiffs repeat and reallege each and every allegation set forth above.

144.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class. This Count is not alleging fraud or intentional conduct or recklessness.

145.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Offering Documents.

146.     As set forth above, the Offering Documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the inaccurate and misleading Offering Documents and participating in efforts to market the IPO to investors.

147.     Defendants owed to the purchasers of Global common stock, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in the exercise of reasonable care, should have known that the Offering Documents and related documents contained misstatements and omissions of material fact. Defendants did not make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts necessary to make such statements not misleading.

148.     Plaintiffs and the other members of the Class purchased or otherwise acquired Global common stock pursuant and/or traceable to the Offering Documents, and neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Offering Documents.

149.     By reasons of the conduct herein alleged, each Defendant violated Section 12(a)(2) of the Securities Act.

150.     By virtue of these violations, Plaintiffs and the other members of the Class have sustained damages.

151.     Less than one year has elapsed from the time that Plaintiffs discovered the facts upon which this complaint is based to the time that Plaintiffs filed the initial Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this Complaint.

### COUNT III

**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

152.     Plaintiffs repeat and reallege each and every allegation contained above.

153.     This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants. This Count is not alleging fraud or intentional conduct or recklessness.

154.     Each of the Individual Defendants was a control person of Global by virtue of his position as a director and/or senior officer of Global.  Further, by reason their ability to make public statements in the name of Global, and further by their connections to SunEdison and its status as a controlling entity of Global, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Global to engage in the conduct complained of herein.

155.     Each of the Individual Defendants were culpable participants in the violation of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the IPO to be successfully completed.  By reason of such wrongful conduct, Plaintiffs and the Class suffered damages for which these Defendants are liable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.     Declaring this action to be a proper class action maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class representatives;

B.     Awarding Plaintiffs and other members of the Class compensatory damages;

C.     Awarding Plaintiffs and other members of the Class rescission on their §12(a)(2) claims;

D.     Awarding Plaintiffs and other members of the Class interest and their costs and expenses, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     Awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  January 16, 2017

                              **ABRAHAM, FRUCHTER & TWERSKY, LLP**


                              /s/ Jack G. Fruchter
                              JACK G. FRUCHTER
                              MITCHELL M.Z. TWERSKY
                              LAWRENCE D. LEVIT
                              CASSANDRA L. PORSCH
                              One Penn Plaza, Suite 2805
                              New York, NY 10119
                              Tel:  (212) 279-5050
                              Fax: (212) 279-3655
                              jfruchter@aftlaw.com
                              mtwersky@aftlaw.com
                              llevit@aftlaw.com
                              cporsch@aftlaw.com

– and –

IAN D. BERG (admitted *pro hac vice*)
TAKEO A. KELLAR (admitted *pro hac vice*)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Tel: (858) 764-2580
Fax: (858) 764-2582

*Attorneys for Lead Plaintiff Pyramid Holdings,
Inc. and Lead Counsel for the Class*

**ROBBINS ARROYO, LLP**
Brian James Robbins
George C. Aguilar
600 "B" Street
Suite 1900
San Diego, CA 92101
(619) 525-3990
Fax: (619) 625-3991
brobbins@robbinsarroyo.com
gaguilar@robbinsarroyo.com
*Attorneys for Plaintiff Iron Workers Mid-South
Pension Fund*

**GLANCY & BINKOW GOLDBERG LLP**
Ex Kanos S Sams , II
Lionel Z. Glancy
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 201-9150
Fax: (310) 201-9160
esams@glancylaw.com
lglancy@glancylaw.com
*Attorneys for Plaintiff Simon Fraser*